# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DIANE ST. AMOUR,<br> *Plaintiff*,<br><br>  v.<br><br>LAWRENCE & MEMORIAL CORP.,<br>LAWRENCE & MEMORIAL HOSPITAL,<br> *Defendants*. | No. 3:09-cv-01055 (JAM) |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Diane St. Amour worked at defendant Lawrence & Memorial Hospital (the Hospital), a subsidiary of defendant Lawrence & Memorial Corp. She alleges that defendants subjected her to sex-based discrimination in the form of a hostile work environment, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and failed to accommodate her actual or perceived disability of hypertension in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. She also alleges violations of the state law counterparts to Title VII and the ADA, as well as other state law claims.

Defendants have moved for summary judgment on all counts (Doc. #82), and plaintiff has moved for summary judgment on her ADA claim (Doc. #87). For the reasons set forth below, I conclude that triable issues of fact remain as to plaintiff's Title VII retaliation claim and plaintiff's failure-to-accommodate claim.

## BACKGROUND

Plaintiff worked as a medical technologist in the chemistry laboratory at the Hospital. In 2007, the Hospital's chemistry and serology departments merged, causing tension amongst employees who would soon be required to cross-train one another. Several male and female

employees in the newly merged laboratory treated plaintiff quite poorly; they openly questioned her competency and were often short-tempered, harsh, and confrontational about work-related issues. This workplace aggression affected employees other than plaintiff, men and women alike.

Gary Lowe was understood by management to be particularly aggressive at work. Among other inappropriate actions, Lowe suggested that "corporal punishment" be applied to lab employees who showed incompetence, and said that he would "go postal" because of the lab merger and that he wanted to "shake sense into" other, less able employees. He made derogatory comments to other employees, including telling a male employee that the employee was too fat for his lab coat and otherwise cursing in the lab. He also physically displayed his anger, at times slamming objects down when he got frustrated and exclaiming that his coworkers were "idiots" or "stupid." Lowe's actions had other violent undertones, whether actual or perceived.[1] Lowe had received coaching by management to remedy his inappropriate tone and comments during cross-training with employees of the newly merged lab. Yet during plaintiff's cross-training with Lowe, he became vocally impatient and frustrated.

Plaintiff claims that she fell victim to sexual harassment at the hands of Lowe from several incidents. She felt harassed by Lowe's telling of blonde jokes, at least several of which were sexual in nature. Though plaintiff was offended by most of these blonde jokes (she was blonde), she at times participated in the banter surrounding them and otherwise faltered in indicating to Lowe that she was offended. Plaintiff felt particularly harassed by an incident in which Lowe referred to plaintiff's lab initials, "LAB.STD"—standing for Laboratory, St. Amour,

---

[1] Lowe discussed his interest in hunting and weapons at work, and he once brought in a hunting knife, which he used to open boxes in front of plaintiff. On one occasion, he caused the Hospital to go into lockdown because a nurse mistakenly believed Lowe to have brought a weapon to work when, in fact, he had been carrying a canoe paddle. He was also rumored to have brought a bow and arrow to work. Plaintiff did not observe the canoe-paddle or bow-and-arrow incidents.

2

Diane—and said loudly that plaintiff was the "sexually transmitted disease of the lab." Plaintiff also felt harassed because of several physically intimidating incidents involving Lowe. During one of Lowe's angry discussions with a coworker, Don Tobin, plaintiff ended up as collateral damage, getting pushed about 6 to 8 inches, though she did not fall down or otherwise get hurt. During another incident, Lowe was frustrated about a centrifuge and elbowed her, though, again, plaintiff was not hurt. At least once, Lowe invaded plaintiff's physical space by getting close and making a hand gesture close to plaintiff's face that suggested that a "good slap" was in order to get plaintiff to work harder.

Other employees contributed to plaintiff's discomfort at work, among them Don Tobin and Lynne Burns. Plaintiff was called "bamboo," a nickname plaintiff had adopted during prior work in a different department because it was the name of her hair dye, though she became offended when a coworker said it sounded like the name of a stripper or a "bimbo." Management also knew that Lowe, Tobin, and Burns were aggressive at work.

After several months of tension at work, plaintiff began to experience physical manifestations of her stress and discomfort. Though she had a history of essential hypertension beginning in August of 2006, she began to experience levels of hypertension after the lab's merger in 2007 that could no longer be adequately controlled by the four prescription medicines she took. On September 11, 2007, plaintiff's blood pressure reached a height of 209/88, causing her to seek emergency treatment at the Hospital for her hypertension, as well as for acute headaches, neck pain, nausea, vomiting, and sleep issues. After her hospitalization, plaintiff saw several doctors who opined that stress contributed to and likely caused at least some of her symptoms.

Though the LAB.STD incident occurred on September 28, 2007, plaintiff waited several days to complain about it to her supervisor on October 2, 2007, and followed up with a formal complaint on October 5, 2007. Meanwhile, on October 16, 2007, plaintiff's doctor prescribed her medical leave from work because her hypertension was worsening.[2] He attributed the worsening of her symptoms to plaintiff's hostile, stress-inducing, and thoroughly unhealthy work environment, which he communicated to the Hospital. Plaintiff's counsel, too, informed the Hospital that plaintiff's stressful work environment caused plaintiff to "suffer physical, emotional and psychological harm, some of which has required medical intervention and management on a continuing basis." Doc. #84-36.

Plaintiff suggested that the Hospital alter her schedule so that she would no longer have shifts with Lowe, who was the main cause of plaintiff's stress. But by that time, the Hospital had undertaken and completed its investigation of the LAB.STD incident and concluded that, although morale was very low in the department, no sexual harassment had occurred. The Hospital instructed Lowe and Tobin not to retaliate against plaintiff for complaining about the incident and then declined plaintiff's request to switch work schedules to avoid contact with Lowe, explaining that to do so would have lent truth—in the Hospital's view—to plaintiff's claim that Lowe had sexually harassed her.

After almost two months on leave, plaintiff returned to work in December 2007. She again asked her supervisor whether she could modify her work schedule to avoid contact with Lowe and Tobin, and she offered up at least one coworker who could trade weekends with

---

[2] The Hospital originally processed plaintiff's leave of absence as leave under the Family and Medical Leave Act (FMLA). On the FMLA forms, plaintiff's doctor stated that she was advised to stay away from work on a week-to-week basis until the adverse work situation was resolved. But plaintiff soon objected to classification of her leave under the FMLA because she would not have had to take FMLA leave if the Hospital had controlled and ameliorated the unhealthy work environment that contributed to her medical condition. The Hospital disagreed, stating that the cause of plaintiff's health issues was irrelevant in determining whether plaintiff's leave should have been classified under the FMLA; it declined to consider placing plaintiff on paid administrative leave.

plaintiff to accomplish this. Her request was again denied, because the laboratory director had received assurances from Lowe that his behavior would not be an issue, because accommodating plaintiff's schedule would invite other employees to express dissatisfaction about their schedules, and because the sexual harassment investigation had revealed no wrongdoing. After several weeks back at work, plaintiff had several uncomfortable interactions with coworkers other than Lowe, including her supervisor, Barbara Naillis, and Burns. At least one incident prompted plaintiff to file a complaint with HR. But the stressful conditions continued, culminating in plaintiff's admission to the hospital on December 28, 2007, for dangerously high blood pressure.

On advice of her doctor, who attributed plaintiff's worsening condition, again, to workplace stress, plaintiff took another leave of absence. Her doctor recommended that she return to work only if she would be assigned to an alternative position, report to a new supervisor, and be treated in a respectful, professional fashion. Eventually, plaintiff's FMLA leave expired, she secured employment at a different hospital, informed the Hospital that she took their failure to improve workplace conditions as a "constructive discharge," and left. Plaintiff did not need any accommodations when she started her new job.

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities on February 29, 2008. She filed this lawsuit on July 1, 2009. She alleges that she was subject to sex-based discrimination in the form of a hostile work environment, retaliation, and constructive discharge in violation of Title VII, failure to accommodate her actual or perceived disability of hypertension in violation of the ADA, and several state law claims. Defendants have moved for summary judgment on all counts (Doc. #82), and plaintiff has moved for summary judgment on her ADA claim (Doc. #87).

**DISCUSSION**

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Joint Employer Liability*

There is dispute as to whether the Hospital was plaintiff's sole employer or whether defendant Lawrence & Memorial Corp. was also plaintiff's employer for ADA and Title VII purposes. Under Second Circuit precedent, "the appropriate test under Title VII [and the ADA] for determining when parent companies may be considered employers of a subsidiary's employees" is a four-factor test providing that "[a] parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240–41 (2d

6

Cir. 1995) (applying this test in the Title VII context); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (applying same test in the ADA context). "[T]he four-factor test may be satisfied by a showing that there is an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Cook*, 69 F.3d at 1241. The central inquiry is whether "the [parent company] is part of an 'integrated enterprise' with [the subsidiary], thus making one liable for the illegal acts of the other." *Parker*, 204 F.3d at 341.

Here, it is undisputed that the Hospital is an entity separate from its parent corporation, Lawrence & Memorial Corp. Doc. #84-23 (Epps Aff.) at ¶ 21. But plaintiff has adduced evidence that the Board of Directors and the CEO are the same for both companies. Doc. #107 (Cummings Dep.) at 117–21. Plaintiff's evidence of common management creates a genuine issue of material fact regarding the precise relationship and degree of interrelatedness between the parent corporation and its subsidiary. *See Parker*, 204 F.3d at 341. Because a reasonable jury could conclude that the two entities were part of the same "integrated enterprise," I will deny Lawrence & Memorial Corp.'s motion for summary judgment as to whether it was plaintiff's employer for purposes of plaintiff's claims under Title VII and the ADA.

### *ADA Claims*

The ADA prohibits employers from discriminating against an employee on the basis of a disability. *See* 42 U.S.C. § 12112(a). One type of discrimination under the ADA is an employer's failure to provide "reasonable accommodations to . . . an otherwise qualified individual with a disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008). A plaintiff must establish a *prima facie* case of failure-to-accommodate discrimination, and "the *prima facie* burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the

7

ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Grp. Of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

While it is generally the employee's responsibility to inform the employer that an accommodation is needed, an employer must provide a reasonable accommodation for a disability "if the employer knew or reasonably should have known that the employee was disabled." *Brady*, 531 F.3d at 135. Once it is clear that the employee has a disability, "the ADA contemplates that employers will engage in an interactive process [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." *Ibid*.

"In discrimination cases based . . . on failures to accommodate, the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013). "Whether a requested accommodation is a reasonable one must be evaluated on a case-by-case basis." *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999).

In this case, defendants as employers are subject to the ADA's anti-discrimination rules. 42 U.S.C. § 12111(5)(A). The issues in dispute are whether plaintiff was disabled within the meaning of the ADA, whether defendants had notice of any disability, and whether defendants failed to provide her with a reasonable accommodation.

During the period of time relevant to the instant suit, the ADA defined disability in relevant part as "a physical or mental impairment that substantially limits one or more of the

major life activities of such individual." *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 74 (2d Cir. 2003) (quoting 42 U.S.C. § 12102(2) (1995)), superseded by ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). "An impairment 'substantially limits' a major life activity if the impaired person is '[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform' the activity." *Parada v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014). Relevant factors in determining whether an individual is substantially limited in a major life activity include the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2) (rev. to 2007).

Defendants principally assert that plaintiff's hypertension did not substantially limit the claimed major life activities of eating, sleeping, and concentrating because (1) her blood pressure stabilized after she left the Hospital's employ, (2) plaintiff's disability (or the effects thereof) were not permanent, and (3) hypertension was not considered to be a disability under the facts of other cases. As to defendants' first argument, an impairment is not "substantially limiting" if, during the period of claimed disability, the impairment has been corrected by mitigating measures, *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999), but the "correction" of plaintiff's hypertension here did not occur until *after* her period of claimed disability—*after* she left the Hospital. A plaintiff need not prove future or continuing disability in order to prove that she was disabled in the past and that her employer violated the ADA in the face of that disability.

As to defendants' second point, "the permanent or long term impact of or resulting from the impairment" is a factor that informs whether that impairment substantially limits a major life activity, but a plaintiff need not have a permanent disability (or suffer permanent injuries from that disability) to be entitled to the protections of the ADA. Even if that were somehow a

requirement, the record is replete with evidence demonstrating a "*permanent* change in [plaintiff's] cardiovascular condition, which required further and more diligent long term medical observations and intervention," and "a strong likelihood that the degree of her hypertension and the need for controller medications has been *permanently* worsened." Doc. #89 at ¶ 41 (emphasis added). Dr. Sprecace also found that plaintiff "ha[d] incurred *permanent* partial disability of her cardio-vascular system as reflected in the hypertension (high blood pressure) that has worsened in degree and in the number of medications needed to control that condition." *Id.* at ¶ 43 (emphasis added).

Finally, that hypertension was not considered to be a disability under the facts of other cases only minimally informs whether plaintiff was disabled *in this case*. *See Parada*, 753 F.3d at 69 (inquiry is "fact-specific"). In this case, then, viewing the facts in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether plaintiff was "disabled" under the ADA, including the factual issue of whether her impairment substantially limited her ability to concentrate or sleep.[3] Plaintiff adduced evidence that her hypertension substantially limited her major life activity of concentrating, including evidence that her hypertension caused her severe headaches. Plaintiff's impairment escalated to the point that she was hospitalized on several occasions, and her visits to the emergency rooms and other doctors during the relevant time period revealed dangerously high blood pressure, along with a host of other ailments—acute headaches, neck pain, back pain, chest tightness, shortness of breath, nausea, dizziness, vomiting, sleep issues—that impacted the ability to concentrate or sleep. *See* Doc. #89. Plaintiff exhibited extremely high blood pressure despite four controlling medicines, and she reported to her doctor

---

[3] I am not convinced that plaintiff has established a genuine issue of fact as to whether her impairment substantially limited her ability to eat. Whether plaintiff was or was not diagnosed with TMJ, she did not testify that she was substantially limited in her ability to eat.

her inability to concentrate because of constant "thinking and worrying about L&M." Pl.'s Ex. G-2. Plaintiff testified that she had difficulty sleeping, that her blood pressure medicine caused tiredness and numbness, her sleep patterns were erratic, and she had anxiety. Doc. #84 at ¶ 502. I conclude that a triable issue of fact remains as to whether plaintiff was disabled under the ADA.

It follows that a genuine issue of material fact also exists as to whether the Hospital knew or should have known that plaintiff was disabled. *See Brady*, 531 F.3d at 135. Various individuals at the Hospital (including plaintiff's supervisor and the HR department) were well aware of plaintiff's FMLA requests, which were approved on several occasions. Doc. #89 at ¶ 25. Furthermore, the Hospital knew that Dr. Sprecace had ordered plaintiff to stay away from work due to her "dangerous hypertension." *Id.* at ¶ 26. This could lead a jury to conclude that the Hospital knew or reasonably should have known of plaintiff's disability.

There are also genuine issues of material fact regarding whether plaintiff requested and was denied a reasonable accommodation. As to whether plaintiff requested a reasonable accommodation, plaintiff states that her request for a change in the scheduling of her work shifts to alternate weekends (so as not to work in the lab at the same time as Lowe and Tobin) was her request for a reasonable accommodation. *See* Doc. #90 at 32. The ADA contemplates that "modified work schedules" may be an appropriate reasonable accommodation under certain circumstances. *See* 42 U.S.C. § 12111(9)(B).

Because a reasonable jury could conclude that plaintiff's request was a reasonable one, the defendant's denial of that request could violate the ADA. Indeed, the undisputed evidence shows that when she made this request, the Hospital denied it out of hand. The Hospital attempts to justify its out-of-hand denial of her request by stating that plaintiff's *other* demands—requesting to work in another department and to be placed on paid administrative leave—were

*per se* unreasonable. *See* Doc. #99 at 27–28. But that some of plaintiff's demands overreached does not excuse the Hospital from the requirement that it engage in the interactive process designed to ferret out the potentially unreasonable aspects of plaintiff's demands, especially where plaintiff *also* helpfully suggested a reasonable accommodation. *See McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 100–01 (2d Cir. 2009) (noting that "an employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance that it will be found to have violated the ADA"). A reasonable jury could conclude that, under the facts of this case, plaintiff requested a reasonable accommodation which was then denied by the Hospital; this remains true even though plaintiff's request for a schedule change came in the context of her complaints of sexual harassment.

In light of the foregoing, triable factual issues remain regarding whether: (1) plaintiff was disabled under the ADA, (2) defendants had notice of the disability, and (3) plaintiff could have performed the essential functions of her job with a reasonable accommodation that defendants refused to grant. Accordingly, I will deny the parties' cross-motions for summary judgment on plaintiff's ADA claim as alleged in Count 4 of the complaint. I will, however, grant defendants' motion as to plaintiff's perceived disability claim (Count 5), because there is no evidence of discrimination by defendants on the basis of a mistaken perception by defendants that plaintiff was disabled.

### Title VII Claims

Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). In the present case, plaintiff brings sex-based

claims for a hostile work environment, retaliation, and constructive discharge. I will address each

of these claims in turn.

*Hostile Work Environment (Count 1)*

Plaintiff's hostile work environment claim requires her to show that "the complained of

conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable

person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively

perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's

sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (*per curiam*). The complained-of

conduct must be either "a single incident [that] was extraordinarily severe, or . . . a series of

incidents [that] were sufficiently continuous and concerted to have altered the conditions of [a

plaintiff's] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

Moreover, "[t]he *sine qua non* of a gender-based discriminatory action claim under Title VII is

that the discrimination must be *because of sex*," rather than for some other reason. *Patane*, 508

F.3d at 112.

Plaintiff has failed to show a connection between harassing treatment from her coworkers

and her sex. In determining whether the challenged conduct was made on the basis of sex, I may

"consider only abusive conduct proven to be 'based on sex' . . . [which] may be proven by

harassment in such sex-specific and derogatory terms as to make it clear that the harasser is

motivated by general hostility to the presence of women in the workplace," among other reasons.

*Pucino v. Verizon Wireless Comm'cns, Inc.*, 618 F.3d 112, 117–18 (2d Cir. 2010). The vast

majority of conduct complained of by plaintiff—Lowe's fixation on weapons, his possession of a

knife at work, his bringing of a canoe paddle and a bow and arrow to work, his shoving of

plaintiff, his sharp tone with plaintiff, his engaging in loud arguments with other coworkers, and his support of corporal punishment, as well as other harsh treatment from other male and female coworkers—is unconnected to the presence of women in the workplace. While "a plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based," *Pucino*, 618 F.3d at 118, no reasonable fact-finder could conclude that these ostensibly sex-neutral incidents were, in fact, based on sex. Quite to the contrary, the undisputed evidence reveals that Lowe and Tobin were overly aggressive and confrontational to men and women alike, demonstrating an unpleasant and unprofessional working environment for all. *Cf. Moll v. Telesector Res. Grp.*, 760 F.3d 198, 203 (2d Cir. 2014).

Focusing, then, on the overtly sex-based conduct, the only abusive conduct plaintiff has proven to be based on sex is: (1) Lowe's telling of several "blonde jokes;" (2) plaintiff's nickname of "bamboo" and/or "bimbo"; and (3) the LAB.STD incident. While there is no precise formula for determining whether conduct was sufficiently severe and pervasive to establish a hostile work environment, the Second Circuit has found insufficient evidence to establish severity or pervasiveness of sex-based conduct under far worse circumstances than those presented here. *See, e.g.*, *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (an appreciative comment about plaintiff's buttocks and a deliberate touching of her breasts insufficient to establish a hostile work environment); *Alfano*, 294 F.3d at 379–81 (twelve alleged incidents, including several with sexual overtones, insufficient to establish a hostile work environment); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004) (six incidents occurring within a one-month period, including a supervisor propositioning the plaintiff for sex, was "not sufficiently severe to" establish a hostile work environment).

Even when the facts are viewed in the light most favorable to plaintiff as the non-moving party, the facts fall well below the threshold needed to establish a hostile work environment. The three sex-related incidents consist of "simple teasing, offhand comments, or isolated incidents of offensive conduct" that are insufficient to support plaintiff's claim of discriminatory harassment. *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). No one incident is "extraordinarily severe," nor are the series of the incidents, taken together under the totality of the circumstances, "sufficiently continuous and concerted to have altered the conditions of [plaintiff's] working environment." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013). Because no reasonable jury could conclude that plaintiff's work environment was *objectively* hostile and abusive, her hostile work environment claim will be dismissed.

Nor has plaintiff shown that defendants should be held liable for her coworkers' actions. "Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). "Where an employee is the victim of [sex-based] harassment, including harassment in the form of a hostile work environment, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino*, 385 F.3d at 225.

There is no dispute that the persons engaging in the conduct outlined above were non-supervisory coworkers. Insofar as any of the conduct of non-supervisory coworkers (particularly the conduct of Lowe and Tobin) could be considered harassment actionable under a Title VII hostile work environment claim, that conduct cannot form the basis for plaintiff's complaint against her employer because: (1) plaintiff had a reasonable avenue for complaint, of which she

15

availed herself on October 2, 2007, and (2) the Hospital took action to address the situation, including meeting with plaintiff three times and interviewing plaintiff's coworkers (a majority of staff—both male and female—in the lab). *See Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013). After its investigation, the Hospital's Human Resources manager concluded that, although the lab was a stressful place in which employees were often "short" and engaged in inappropriate bantering and joking, there was no evidence of any sex-based harassment. Even without the presence of sex-based harassment, the manager counseled Lowe and Tobin about their tone, and reminded them not to retaliate against plaintiff for making her complaint. In light of the foregoing, there can be no genuine dispute of material fact that the Hospital provided a reasonable avenue for complaint and took reasonable action, under the circumstances, to address the situation.

*Retaliation (Count 2)*

Plaintiff's Title VII retaliation claim requires her to show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001). An adverse employment action is judged by an objective standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. . . . [N]ormally petty slights, minor annoyances, and simple lack of good manners in the workplace fall well short of this standard." *Sacco v. Legg Mason Inv. Counsel & Trust Co., N.A.*, 660 F. Supp. 2d 302, 313 (D. Conn. 2010) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

Plaintiff's principal contention is that her protected activity—here, complaining to her supervisor about the LAB.STD incident—caused a materially adverse employment action: the Hospital's failure to accommodate her disability in violation of the ADA. *See* Doc. #106 at 61–64.[4] Although plaintiff does not cite any cases holding that an employer's failure to accommodate in violation of the ADA constitutes an adverse employment action for purposes of Title VII retaliation, it should go without saying that an employer's violation of one anti-discrimination law might dissuade a reasonable worker from making a charge of another kind of discrimination. An employer's failure to accommodate an employee's disability is far more than a "mere inconvenience," *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), as a disabled employee by definition is substantially limited in a major life activity.

Turning, then, to whether the Hospital's failure to accommodate her disability was caused by retaliation for her protected activity under Title VII, plaintiff must demonstrate that "the desire to retaliate was the but-for cause of the challenged employment action." *See Univ. of Texas Southwest Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). "'But-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.

Plaintiff has adduced evidence sufficient to raise a genuine issue of material fact as to whether the Hospital's denial of a reasonable accommodation of her disability was caused by its motive to retaliate for plaintiff's reporting a claim of sexual harassment. Plaintiff's manager refused to alter plaintiff's schedule, even after plaintiff offered at least one employee that would

---

[4] Plaintiff also asserts that the adverse-employment-action requirement would be satisfied by her constructive discharge, continuing and escalating post-complaint harassment, and her actual termination on November 9, 2007.

be willing to switch days with her. The manager reasoned that accommodating plaintiff's schedule would indicate to the rest of the laboratory that Lowe and Tobin had committed misconduct, and the manager did not want to unfairly label them as sexual harassers by accommodating plaintiff's request. Doc. #84 at ¶ 417. In response to one of plaintiff's schedule-change proposals, her manager queried to HR: "Why should I allow her to work [her proposed altered schedule] this week?" Pl.'s Ex. U. In response to another of plaintiff's schedule-change proposals, her manager wrote to HR: "She just will not give up….I'm getting tired of it already. This is the second message today regarding the weekend." *Id.* Plaintiff's manager also e-mailed HR, expressing joy upon learning that plaintiff's EEOC complaint had been dismissed, writing "Please, Tell me this is true and it means what I think it does!!!!! If so, let me know so I can come down and hug you!!!" Pl's Ex. Z.

    In the context of this case, in which the Hospital knew that the laboratory was a toxic place to work and that plaintiff claimed that this toxic environment caused stress that severely exacerbated her hypertension to the point of hospitalization, a reasonable inference can be made that the Hospital harbored at least some retaliatory motive towards plaintiff for complaining (even hastily or excessively complaining) about what she perceived to have been sexual harassment. The Hospital expressed harsh indifference to plaintiff's requests for a schedule change, even after plaintiff had conveniently lined up a coworker to switch days with her. Because a reasonable jury could conclude that the Hospital's failure to accommodate plaintiff's disability by acquiescing to a reasonable schedule change—which I have determined is a triable issue—might not have occurred in the absence of a retaliatory motive, and because the Hospital has not addressed the other portions of the framework governing claims of retaliation, I will deny defendants' motion for summary judgment on this count.

*Constructive Discharge (Count 3)*

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino*, 385 F.3d at 229. If an employee has resigned, as is the case here, *see* Doc. #83 at 50–51, a constructive discharge will be found only if the "working conditions [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000). Even though a reasonable jury could conclude that the Hospital's failure to make reasonable accommodations of plaintiff's disability could constitute retaliation under Title VII, for substantially the reasons set forth in my discussion of Count 1, I will grant the defendants' motion for summary judgment on this count of constructive discharge. Plaintiff has failed to provide evidence of any *deliberate* plan or course of action by the Hospital to create an intolerable workplace, nor has she demonstrated that the conditions at the Hospital were objectively intolerable.

### State Law Claims

Finally, defendants asked me to decline to exercise supplemental jurisdiction over the state law claims in the event that I grant summary judgment on all federal claims. Although I will deny their motion on that ground because several federal claims remain for trial, I will grant their motion for summary judgment as to the parallel state law claims whose federal counterparts have failed on their merits. Absent any suggestion by the parties that the state law analysis materially differs from that of their federal law counterparts, those claims also fail on their merits. Accordingly, I will grant summary judgment for defendants on Counts 6 and 8.

## CONCLUSION

Defendants' motion for summary judgment (Doc. #82) is GRANTED as to Counts 1, 3, 5, 6, and 8, and DENIED as to Counts 2, 4, 7, 9–13. Plaintiff's motion for summary judgment (Doc. #87) is DENIED. The parties shall file their joint trial memorandum by October 17, 2016. Please refer to the District of Connecticut website for my "Trial Preferences" and "Instructions for Joint Trial Memorandum."

It is so ordered.

Dated at New Haven, Connecticut, this 12th day of September 2016.

*/s/ Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge